# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

BRENDA JOHNSON,                    :

     Plaintiff,                    :

                                              Case No. 3:13cv00301

vs.                              :

                                              District Judge Thomas M. Rose

CAROLYN COLVIN,                    :     Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,           :

     Defendant.                    :

## REPORT AND RECOMMENDATIONS[1]

## I.    <u>Introduction</u>

Chronic pancreatitis and various other physical and mental impairments have twice led Plaintiff Brenda Johnson to file applications for Supplemental Security Income (SSI). The Social Security Administration granted her first SSI application in March 2008. (*PageID*## 102, 166).  Her second application did not fare as well.

Plaintiff received SSI until September 2009 when she was incarcerated in state prison on a drug possession charge.  (*PageID*# 61; *see PageID*## 341-748).  On May 3, 2010, after her release from prison (*PageID*# 369), she filed her second SSI application, asserting she was under a SSI-qualifying "disability" as of January 1, 2000.  (*PageID*# 146-49).

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

The Social Security Administration denied Plaintiff's second SSI application, mainly through the decision of Administration Law Judge (ALJ) Amelia G. Lombardo.  (*PageID#* 74-98).  ALJ Lombardo's non-disability decision is subject to judicial review, *see* 42 U.S.C. §405(g), which Plaintiff is now due.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #9), the Commissioner's Memorandum in Opposition (Doc. #13), Plaintiff's Reply, (Doc. # 14), the administrative record (Doc. # 7), and the record as a whole.

Plaintiff seeks a reversal of ALJ Lombardo's decision and a remand of this case to the Social Security Administration for payment of SSI.  Plaintiff alternatively seeks a remand of this case to the Social Security Administration to correct certain errors.  The Commissioner seeks an Order affirming ALJ Lombardo's decision.

## II.    Additional Background

### A.    Plaintiff's Age, Education, and Work History

At the time of ALJ Lombardo's decision, Plaintiff was 41 years old, thus placing her in the "younger person" category for purposes of resolving her SSI claim.  *See* 20 C.F.R. § 416.963(c); *see also PageID##* 67, 165.  Plaintiff earned a GED in 2001 and has no past relevant work.  (*PageID##* 67, 93).

Plaintiff testified at the administrative hearing that her physical impairments include emphysema, Hepatitis C, and chronic pancreatitis.  (*PageID#* 80).  She testified that she was no longer using drugs, noting she had stopped six months before the hearing.  (*PageID#* 81).

2

She had difficulty giving up marijuana because, she explained, "it helped with my pain.  I'm in a lot of pain every day with my pancreas."  (*Id.*).

She stated that she had missed appointments because her memory "is shot," and she was trapped in an abusive relationship.  (*PageID#* 81).  She was trying to go to school at Wright State University but she had a hard time keeping a 2.0 GPA due to her reading disorder and being falsely arrested.  (*Id.*).

At the time of the hearing, she was living alternately between her mother's house and a vacant house.  (*PageID#* 82).  She reported not doing much during the day, largely just sleeping and watching TV.  (*PageID##* 84-85, 88).

Her symptoms from her mental impairments include seeing and hearing things that are not there.  (*PageID#* 88).  This occurs almost daily.  She has tried medication, Abilify, which helped with the voices, but her "system" couldn't handle the medication dosage.  (*Id.*).  She believes people are talking about her and "out to get me."  (*PageID#* 89).  Sometimes she can go for a over week without leaving her house.  (*Id.*).  She also testified about experiencing memory problems.  (*PageID#* 89).  She is nervous around other people and does not like going to the grocery store.  (*PageID##* 90-91).

### B.    Medical Records and Opinions

#### South Community Behavioral Healthcare

E.C. Longo, M.D., a psychiatrist at South Community, completed an assessment of Plaintiff's mental functioning for the Ohio Department of Job and Family Services in

November 2006.  (*PageID*## 873-76).  Dr. Longo diagnosed Plaintiff with schizoaffective disorder bipolar type, Posttraumatic Stress Disorder, cocaine dependence/alcohol dependence – in remission, "great difficulty with reading/math due to leaving school in the 6th grade." (*PageID*## 874-75).  Dr. Longo opined that Plaintiff has "too many anxiety, psychiatric, and mood symptoms to be able to be employed," and Dr. Longo characterized Plaintiff as "unemployable." (*PageID*# 874).  Dr. Longo further opined that Plaintiff is markedly limited in her ability to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others.  (*PageID*# 873).

The administrative record contains an undated initial psychiatric evaluation during which Plaintiff evidenced a moderately depressed mood.  She was mildly anxious with full affect.  She was cooperative.  Her insight/judgment was "poor to fair at best."  She was diagnosed with bipolar I disorder (severe with psychotic features), Posttraumatic Stress

Disorder, cocaine dependence, polysubstance dependence, and history of reading and math disorder.  Plaintiff was assigned a GAF of 45.[2]  (*PageID#* 340).

Treatment records dated May 2008 through May 2009 showed Plaintiff reports of feeling isolated, hopeless, sad, and anxious with low energy, decreased motivation, crying spells, and constant nervousness.  (*PageID##* 290, 314-15, 326-34).  She also reported a history of mental abuse by her mother and physical abuse by her brother, being raped twice at age 13, being raped twice as an adult, and experiencing 3 miscarriages. (*PageID#* 313).  She was also noted to be disheveled, stressed, depressed, hyperactive, and restless during her sessions.  (*PageID##* 327-34, 337, 340).  She was diagnosed with schizoaffective disorder, bipolar disorder, posttraumatic stress disorder, cocaine dependence, polysubstance dependence (in remission).  (*PageID##* 283, 291, 293-94, 301, 304, 315-16).  Her GAF assessment ranged between 40 and 45.  (*Id.*).

**Ohio State University Hospital**

Plaintiff was hospitalized in September 2009 due to an acute pancreatitis flare up.  (*PageID##* 251-77).  Abdomen x-ray during admission showed non-obstructive bowel gas pattern with fecal residue in the entire colon.  (*PageID#* 253).  An ultrasound showed

---

[2] "GAF," Global Assessment Functioning, is a tool used by health-care professionals to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness.  It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation.  *See Martin v. Commissioner*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision (DSM-IV-TR) at 32-34. A GAF of 45-50 indicates "severe symptoms ... or  serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)...."  (*Id.*)

hypoechoic pancreas with mild ductal prominence, which "may be due to pancreatitis." (*PageID*# 254).  It further showed mild dilation of the intrahepatic biliary radicles.  Mild increase in cortical echogenicity of the right kidney, which "may be due to medical renal disease." (*PageID*# 254).  At discharge on September 8, 2009, her vitals were normal and her abdomen was soft, nontender, nondistended.  Her bowel sounds were normal.  She had full strength in all extremities.  (*PageID*## 264-65).

## Ohio Department of Rehabilitation and Corrections

During her incarceration from July 11, 2009 to May 1, 2010, Plaintiff's diagnoses included Hepatitis C, chronic obstructed pulmonary disease, diabetes, chronic pancreatitis, and asthma.  (*PageID*## 363, 367, 393-94, 407, 410, 417, 430, 436, 438, 441, 462, 609, 797).  She also received mental health treatment while incarcerated.  Her initial mental-health evaluation reflected significant depression and anxiety with poor concentration, auditory hallucinations, cycling moods, paranoid ideation, and a history of abuse. (*PageID*## 427-29).  She was treated with psychotropic medications, which were adjusted over time.  (*PageID*## 370-92, 395, 604-05, 679-90, 694-98).

## Samaritan Behavioral Health

Plaintiff was seen at Crisis Care at Samaritan Behavioral Health in May 2010, after her release from incarceration, on referral from the Franklin Pre-release Center.  During her assessment, Plaintiff related a history of attending residential treatment at Nova House for 17 days but then leaving because she wanted to use crack.  She was arrested for possession

of cocaine after a few days out of treatment. She was taken to Franklin Correctional and received 14 days worth of psychiatric medication (Risperdal and Prozac).

Plaintiff reported that she had been receiving Community Psychiatric Supportive Treatment services at South Community from 2005-2009 before her incarceration. She also reported that she spoke with her case manager at South Community who told her she would be able to return to the agency upon referral from Crisis Care. Concerns were raised with Plaintiff about re-referring her to South Community with her alcohol and drug use history. She reported that her case manager said she could be referred back and she did not want to go to another agency. She requested Community Psychiatric Supportive Treatment services and declined alcohol and drug treatment stating that she had completed this while in prison. (*PageID*## 758, 761). Plaintiff further reported that without medication, she hears voices, is depressed, and experiences mood swings. (*PageID*# 767). She feared being hospitalized without the aid of mental health treatment. (*PageID*# 765). She was diagnosed with schizoaffective disorder bipolar type and substance dependence in sustained full remission and assigned a GAF score of 50. (*PageID*## 767-68).

### Sycamore Women's Wellness Center

Plaintiff was treated at Sycamore Women's Wellness Center in May and September 2010. (*PageID*## 833-37). She reported fatigue/malaise, anxiety, abdominal pain, and diabetes. (*PageID*# 836). She was noted to be fidgety and tearful with palpable tenderness

in her abdomen.  (*PageID*# 837).  Due to chronic back pain and chronic pancreatitis, she was referred to pain management.  (*PageID*# 838).

### Dayton Pain Center

In September 2010, Plaintiff saw a consulting physician, Krishna Reddy, M.D. (a pain management specialist) due to chronic pancreatitis.  (*PageID*## 824-26).  She reported that she always had abdominal pain but her levels periodically spiked to a 10 out of 10. (*PageID*# 824).  Her pain wakes her up at night and prevents her from completing activities during the day.  (*Id.*).  She underwent psychological testing during her evaluation due to her history of schizoaffective disorder.  Her testing showed moderate-to severe anxiety and mild-to-moderate depression.  (*PageID*# 825).  She was prescribed for Tramadol.  (*PageID*# 826).

### Eastway Behavioral Health

Plaintiff began treating at Eastway on October 6, 2010.  (*PageID*## 855-58). Initially, Plaintiff reported frequent mood swings, auditory hallucinations, recurrent suicidal thoughts, problems being around others, and life trauma in her past.  (*PageID*## 856-57).  Intake psychiatrist, Mariella Toca, M.D., diagnosed Plaintiff with schizoaffective disorder bipolar type, cocaine dependence, and her GAF was assessed at 50.  (*PageID*# 858).

Plaintiff saw Dr. Toca for pharmacological management on November 3, 2010. (*PageID*## 859-61).  Plaintiff reported that she did not like being around people.  She reported that her boyfriend was abusive toward her.  She heard voices telling her to hurt

herself and her boyfriend, stating the last time she had heard voices was a "3-4 days ago." She stated she saw people who are not there.  She enjoyed television and was religious but did not attend services.  She experienced suicidal ideation "all the time" but denied any then-current suicidal ideation.  Her last attempt at suicide had been in "June."  She denied any homicidal ideation.  She denied any current alcohol or drug use.  She further reported that had been through treatment in March for her "addictions" and graduated.  She acknowledged that she had smoked "pot" in the last month but had since quit.  Her "nerves" were shot. Plaintiff requested housing assistance and individual therapy.  Dr. Toca found Plaintiff cooperative, restless, and anxious.  She had poor eye contact and speech was intense. (*PageID*# 859).

The record shows that Plaintiff missed multiple appointments.  (*See PageID*## 883-86, 889-96, 901-02, 907-08).

On December 13, 2010, Plaintiff was staying at the YWCA due to domestic issues with her husband who was no longer in jail.  Plaintiff reported taking her medication as prescribed.  (*PageID*# 899-900).

Plaintiff saw Dr. Toca on January 31, 2011, asking for a decrease in Abilify dosage. (*PageID*# 897-98).

On April 25, 2011, Plaintiff saw Thomas Earwood, M.D. for medication management.  He observed Plaintiff's affect to be labile, and she requested an increase in her medications.  (*PageID*## 887-88).

9

On June 10, 2011, Dr. Earwood noted that Plaintiff had "questionable adherence to medications.  She has missed several follow up appointments.  Today, she rambles on about getting her disability and wanting me to mail information directly to her attorney. When weekly medication monitoring was suggested, patient was strongly opposed to this, but couldn't really give a reason as to why.  She says that she is in trouble with the law again for drug related issues, which she says are all false.  Patient denies any cocaine use, but does admit to ongoing marijuana use.  No specific complaints today."  (*PageID*# 881).

That same day Dr. Earwood completed a mental functional capacity assessment. (*PageID*## 877-88).  He opined that Plaintiff is markedly limited in her abilities: to carry out detailed instructions; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to make simple work-related decisions; to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting.  (*PageID*# 877).  He reported Plaintiff's mental-status examinations showed she was, "friendly, upbeat, easily distracted, no abnormal motor, and rapid speech.  Good mood. Congruent affect.  Thought process was circumstantial.  Thought content was without suicidal or homicidal ideation and no audio or

visual hallucinations.  No delusions.  Oriented x4.  Memory and concentration are fair. Insight and judgment are fair." (*PageID#* 878).  Dr. Earwood concluded that Plaintiff is "unemployable." (*PageID#* 877).

On August 29, 2011, she reported that her mood was "more depressed than anything."  She was dealing with issues regarding a protection order.  (*PageID#* 879).

On January 9, 2012, Plaintiff tested positive for marijuana.  She reported that she had not been taking her medication because they were in a box due to her moving recently.  Dr. Toca noted she looked disheveled and tired.  Dr. Toca questioned drug use, but Plaintiff reported she was exhausted from moving.  (*PageID#* 905-06).

### Paul Tangeman, Ph.D./John Waddell, Ph.D., State Agency Review

State agency psychologist, Dr. Tangeman, reviewed the record on behalf of the Ohio Bureau of Disability Determination in June 2010.  (*PageID##* 800-13).  Dr. Tangeman determined that Plaintiff had no restrictions in activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation.  (*PageID#* 810).  Dr. Tangeman found Plaintiff's allegations were partially credible.  (*PageID#* 812).

Dr. Tangeman concluded that Plaintiff was only mildly impaired with drug and alcohol abuse cessation and treatment compliance.  (*PageID#* 812).  On November 10, 2010, another state agency psychologist, Dr. Waddell, reviewed the record and affirmed Dr. Tangeman's opinion.  (*PageID#* 871).

11

**Willa Caldwell, M.D./Paul Morton, M.D.**

State agency physician, Dr. Caldwell, reviewed the file in January 2010 on behalf of the Ohio Bureau of Disability Determinations.  (*PageID*## 814-21).  Dr. Caldwell determined that Plaintiff could lift, carry, push, and pull 50 pounds occasionally and 25 pounds frequently; stand, walk, and/or sit about six hours in an eight-hour workday.  (*PageID*# 815).  Dr. Caldwell concluded, "Careful consideration has been given to [Plaintiff's] statements regarding her alleged symptoms and their impact on her ability to function.  [Plaintiff] reports she is able to attend to her own personal care.  She does some cleaning around the house.  She is able to shop.  She reports trouble lifting, walking.  [Medical evidence of Record] in file does not support [Plaintiff's] allegations therefore her statements are found to be partially credible."  (*PageID*# 819).  In December 2010, state agency physician, Dr. Morton affirmed Dr. Caldwell's assessment.  (*PageID*# 872).

## III.    The "Disability" Requirement and Administrative Review

### A.    <u>Applicable Standards</u>

The Social Security Administration provides SSI to indigent individuals, subject to several eligibility requirements.  Chief among these, for purposes of this case, is the "disability" requirement.  To receive SSI an applicant must be a "disabled individual."  42 U.S.C. §1381a; *see Bowen v. City of New York*, 476 U.S. 467, 470 (1986).  The phrase "disabled individual" – as defined by the Social Security Act – has specialized meaning of limited scope.  It encompasses only those who suffer from a medically determinable physical

or mental impairment severe enough to prevent them from engaging in substantial gainful activity.  42 U.S.C. §1382c(a)(3)(A); *see Bowen*, 476 U.S. at 469-70.

**B.    The ALJ's Decision**

Administrative regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §416.920(a)(4); *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

At step one of the sequential evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 3, 2010, the date of her second SSI application. (*PageID#* 59).

At step two of the sequential evaluation, ALJ Lombardo concluded that Plaintiff has the severe impairment of chronic pancreatitis.  (*Id.*).  ALJ Lombardo determined that Plaintiff's mental conditions are "non-severe" impairments within the meaning of the Social Security Act.  (*PageID##* 60-63).

The ALJ concluded at step three that Plaintiff did not have an impairment or combination of impairments that met or equaled one of the Listings, including sections 5.00 and 9.00.  (*PageID#* 64).

At step four, the ALJ evaluated Plaintiff's residual functional capacity and found that Plaintiff could perform the full range of medium exertional work.  (*Id.*).  Plaintiff has no past relevant work.  (*PageID#* 67).

At step five, the ALJ concluded that – considering Plaintiff's age, education, work experience, and residual functional capacity – she is capable of performing as many as 30,000 jobs at the unskilled medium occupational base in the regional area, including jobs as store laborer, hand packager, or order filler.  (*PageID##* 67, 93).

This assessment, along with the ALJ's findings throughout her sequential evaluation, led her to ultimately conclude that Plaintiff was not under a disability and hence not eligible for SSI.  (*PageID#* 67).

## IV.  <u>Judicial Review</u>

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence."  *Blakley v. Comm'r. of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'"  *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Security*, 375

F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..."  *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r. of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "(E)ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.    Discussion

### A.    Step Two and Residual Functional Capacity

Plaintiff argues that the ALJ error was not simply failing to find that she has a severe mental impairment, schizoaffective disorder, at step two.  She argues that the ALJ "unreasonably omit[ted] mental health limitations throughout her entire analysis of Plaintiff's claim, an omission culminating in her non-disability finding."  (Doc. #14, PageID at 957).

Step two of the sequential analysis – determining whether the claimant has a severe impairment – creates "a *de minimis* hurdle in the disability determination process....  Under the ... *de minimis* view, an impairment can be considered not severe only if it is a slight

abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).

The Commissioner contends that the ALJ's step-two finding is not relevant to the outcome of the case because the ALJ did not deny Plaintiff's disability claim at step two. Instead, the Commissioner argues, that the ALJ "considers the combined effect of all of a claimant's impairments, severe and non-severe, throughout the subsequent steps of the process.  This is because 'the severity of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of a deviation from purely medical standards of bodily perfection or normality." (Doc. #13, PageID at 950) (citations omitted).

The Commissioner is partly correct.  Generally, an ALJ does not commit an error requiring automatic reversal by finding a non-severe impairment under two circumstances: (1) the ALJ also found that claimant has at least one severe impairment; and (2) the ALJ considers both the severe and non-severe impairments during the remaining steps in the sequential evaluation.  *See Maziarz v. Secretary of Health and Human Services*, 837 F.2d 240, 244 (6th Cir. 1987).  Indeed, "once the ALJ determines that a claimant has at least one severe impairment, the ALJ must consider all impairments, severe and non-severe, in the remaining steps." *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) (citation omitted).  "[W]hen an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe

16

impairments at step two '[does] not constitute reversible error.'" *Fisk v. Astrue*, 253 F.

App'x 580, 583 (6th Cir. 2007) (quoting *Maziarz v. Sec'y of Health & Human Servs*., 837

F2d 240, 244 (6th Cir. 1987)).

In the present case, the ALJ's decision at step four does not indicate that she

considered Plaintiff's severe and non-severe impairments when assessing Plaintiff's residual

functional capacity.  This is seen not only in reading the ALJ's step-four analysis, where

mention of mental impairments is wholly absent, but also in the ALJ's emphasis at step four

on Plaintiff's lack of a severe mental impairment.  The latter appears in the many reasons the

ALJ gave at step four to explain (as she did at step two) why Plaintiff lacked a severe mental

impairment:

> The claimant's mental health impairments have been found to be non-severe.  The claimant's lack of medication compliance, appointment non-compliance, and continued use of cannabis adequately demonstrate the 'non-severity' of the claimant's mental impairment.  The claimant does not  attend therapy and refuses to do weekly pill counts.  There have been no hospitalizations for mental impairment.  Dr. Earwood's summary on page two certainly paints an entirely different picture than his check mark form assessment.  The claimant is able to live on her own, attend college classes, and care for her personal needs.  The medical evidence of record does not support a finding of "disabled."

(PageID at 66).  Assuming this suffices to support the ALJ's conclusion that Plaintiff does

not have a severe mental impairment, this does not demonstrate that the ALJ considered

Plaintiff's non-severe mental impairments at step four as required by law.  *See Maziarz*, 837

F2d at 244; *see also Fisk,* 253 F. App'x at 583-84; *Pompa*, 73 F. App'x at 803.

17

The Commissioner, tacking in a different direction, "notes that it is well settled that 'the mere diagnosis of [an impairment], of course, says nothing about the severity of the condition.'" (Doc. #13, PageID at 950) (Commissioner's brackets) (quoting *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)) (other citations omitted).  Plaintiff, however, is not relying on her mere diagnosis of schizoaffective disorder; she points to numerous medical records that document the long-term mental health treatment she has received.  First, before her incarceration, Plaintiff was seen at South Community Behavioral Healthcare, where Dr. Longo, a psychiatrist at South Community, completed an assessment of Plaintiff's mental functioning in November 2006, noting, in part, that she has anxious, psychotic, and mood symptoms and that her PTSD and schizoaffective disorder "are profound."  (*PageID##* 873-76).  Treatment records dated May 2008 through May 2009, showed Plaintiff reported feeling isolation, hopelessness, sadness, anxiousness, low energy, decreased motivation, crying spells, and constant nervousness.  (*PageID##* 290, 314-15, 326-36).  Plaintiff also received mental health treatment while incarcerated.  Her admission mental health evaluation reflected significant depression and anxiety, with poor concentration, auditory hallucinations, cycling moods, paranoid ideation ("she believes the 'Chinese people' are trying to take over the United States"), a history of sexual abuse, and "[s]he believes she can heal people during her manic episodes."  (*PageID##* 427-29).  Plaintiff was provided psychotropic medications which were adjusted over time. (*PageID##* 370-92, 395, 604-05, 679-90, 694-98).

18

The record shows Plaintiff was also seen at Samaritan Behavioral Health in May 2010 where she was diagnosed with schizoaffective disorder bipolar type and substance dependence in sustained full remission and assigned GAF score of 50, indicating "serious symptoms ... or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)...." Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at p. 34. (*PageID*## 767-68). Plaintiff began treatment at Eastway in October 2010 (*PageID*# 855-58) and was still receiving treatment there at the time of the ALJ's hearing. (*PageID*# 80).

The above-discussed records document that Plaintiff has experienced the type of "signs and symptoms" that support the existence of a mental impairment. *See* 20 C.F.R. §416.928(a)-(b). Regardless of whether it was a severe impairment or not, the ALJ's failure to consider all of Plaintiff's mental impairments when assessing Plaintiff's residual functional capacity constituted error. *See Pompa*, 73 F. App'x at 803; *see* 20 C.F.R. §416.945(a)(2) ("We will consider all of your impairments of which we are aware, including your medically determinable impairments that are not 'severe' ... when we assess your residual functional capacity.").

The ALJ's decision contains another legal shortcoming: it fails to demonstrate that the ALJ considered the opinions of Dr. Tangeman and Dr. Waddell under the correct legal criteria. Both these physicians examined the record but did not examine or treat Plaintiff. As to Dr. Tangeman, the ALJ recognized, "According to Dr. Tangeman, the claimant does not

have a 'severe' mental impairment within the meaning of the Social Security Act." (Doc.

#7, PageID at 62).  The ALJ merely observed that Dr. Waddell concurred with Dr.

Tangeman's opinions.  *Id.*  Because the ALJ rejected the opinions of the other medical

sources concerning the severity of Plaintiff's mental impairment, only Dr. Tangeman and

Dr. Waddell's opinions supported the ALJ's conclusion that Plaintiff did not have a severe

mental impairment.  *Id.*, PageID at 62-63.

       The Regulations and Social Security Rulings required the ALJ to weigh the opinions

of non-treating physicians under the regulatory factors, including supportability, consistency,

and specialization.  *See* 20 C.F.R. §404.1527(d), (f); *see also* Social Security Ruling 96-6p,

1996 WL 374180 (Aug. 9, 2006).  The Regulations appear to emphasize this requirement by

reiterating it no less than three times.  *See* 20 C.F.R. §404.1527(d) ("we consider all of the

following factors in deciding the weight to give any medical opinion...."); *see* also 20 C.F.R.

§404.1527(f)(ii) (factors apply to opinions of state agency consultants); 20 C.F.R.

§404.1527(f)(iii) (same as to medical experts' opinions); Social Security Ruling 96-6p, 1996

WL 374180 at *2 (same).  The ALJ's decision does not contain any mention of these factors

as applied to Dr. Tangeman and Dr. Waddell's opinions at step two.  The ALJ therefore

failed to apply the correct legal criteria to evaluate their opinions.  There is, consequently, no

way to conduct a meaningful appellate review of the ALJ's acceptance of their opinions.  In

addition, this was not harmless error because neither Dr. Tangeman nor Dr. Waddell

reviewed Plaintiff's entire mental-health records.  Dr. Tangeman reviewed the record in June

2010; Dr. Waddell reviewed the records in November 2010.  As a result, they did not consider any later mental-health records, including the records and opinions provided by Drs. Earwood and Dr. Toca.  And given this, it was especially important for the ALJ to evaluate and explain her consideration of Dr. Tangeman under the correct legal criteria.  *See* 20 C.F.R. §416.972(c)(3) ("We will evaluate the degree to which these [nonexamining medical sources'] opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.").

Accordingly, for all the above reasons, Plaintiff's Statement of Errors is well taken.[3]

## B.    Remand Is Warranted

If the ALJ failed to apply the correct legal standards or her factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits.  Under Sentence Four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Secretary of H.H.S.,* 17 F.3d 171, 176 (6th Cir. 1994).

---

[3] In light of the above review, and the resulting need to remand of this case, analysis of the parties' remaining arguments is unwarranted.

A judicial award of benefits is unwarranted in the present case, because the evidence of disability is not overwhelming, and because the evidence of a disability is not strong while contrary evidence is weak. *See Id.* However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of §405(g) due to problems discussed above. And, because there as been no administrative assessment of the impact Plaintiff's mental impairments – severe and non-severe – have on her residual functional capacity. These factual determinations must be made by the Commissioner in the first instance. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulation and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether her application for SSI should be granted.

## IT IS THEREFORE RECOMMENDED THAT:

1.  The Commissioner's non-disability finding be vacated;

2.  No finding be made as to whether Plaintiff Brenda Johnson was under a "disability" within the meaning of the Social Security Act;

3.  This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. §405(g) for further consideration consistent with this Report; and

          4.      The case be terminated on the docket of this Court.

November 19, 2014

                                              s/Sharon L. Ovington

                                             Sharon L. Ovington

                              Chief United States Magistrate Judge

23

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen (17) days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).

24